NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0318n.06

No. 21-4098

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 13, 2023
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BLUE FIRE CAPITAL, LLC,            ) | |
|        Plaintiff – Appellant,           ) | ON APPEAL FROM THE |
|                                    ) | UNITED STATES DISTRICT |
|            v.                   ) | COURT FOR THE |
|                                    ) | SOUTHERN DISTRICT OF |
| PIES & PINTS DEVELOPMENT    ) | OHIO |
| PARTNERS, LLC, ROBERT A. LINDEMAN,   ) | |
|        Defendants – Appellees.         ) | OPINION |

Before: KETHLEDGE, WHITE, and BUSH Circuit Judges.

The court delivered a PER CURIAM opinion in which KETHLEDGE and BUSH, JJ., joined in full, and WHITE, J., joined in part. WHITE, J. (pp. 25–26), delivered a separate opinion dissenting in part.

**PER CURIAM.** Plaintiff-Appellant Blue Fire Capital (Blue Fire) appeals the dismissal with prejudice of its case against Defendant-Appellee Pies & Pints Development Partners, LLC and its sole manager, Defendant-Appellee Robert Lindeman. For the reasons that follow, we **AFFIRM** the district court's dismissal with prejudice.

**I.**

In August 2011, Plaintiff-Appellant Blue Fire Capital, LLC, managed by Michael Sloane, joined with R&M Advisors, LLC (R&M), owned by Defendant-Appellee Rob Lindeman, to form a partnership named Pies & Pints Development Partners (PPDP). That partnership was established for the purpose of investing in and developing the Pies & Pints restaurant brand. Under the terms of the PPDP operating agreement, Blue Fire and R&M each own 50% of PPDP. Lindeman was appointed the sole manager of PPDP.

In 2012, PPDP partnered with KSDB, LLC (KSDB), at the time owned by Kimberly Shingledecker and David Bailey, to form Pies & Pints Management Company, LLC (PPMC)—a management company that owns twelve Pies & Pints restaurants. The only two members of PPMC are PPDP (60% owner) and KSDB (40% owner). Under the terms of the original operating agreement, Lindeman controlled PPMC as the sole manager.

Blue Fire alleges that in 2019, due to transparency concerns and conflicts of interest, the owners of KSDB and Sloane came to believe that Lindeman no longer represented PPMC's best interests. As a result, Blue Fire drafted an amended operating agreement to change the governance structure of PPMC so that it was controlled by a board of four managers, rather than Lindeman as sole manager. Under the Amended Operating Agreement, the managers were Lindeman, Sloane, Kim Shingledecker and David Bailey. Accordingly, the corporate structure of PPMC was as follows:



R.1-1, PID 7.

2

The Amended Operating Agreement allocated Lindeman, the R&M Manager, 1.5 votes on the Board of Managers; Sloane, the Blue Fire Manager, 1.5 votes on the Board of Managers; Shingledecker, the first KSDB Manager, 1 vote on the Board of Managers; and Bailey, the second KSDB Manager, 1 vote on the Board of Managers. R.28-5, PID 1286. The votes broke down so that PPDP, which held a 60% interest in PPMC, held 3 votes on the Board of Managers, and KSDB, which held a 40% interest in PPMC, held 2 votes.

In March 2020, Sloane, Shingledecker and Bailey took "Action by Written Consent of the Managers without a Meeting" (March 2020 Action) and terminated Lindeman's position as president of PPMC, hired Martin O'Dowd as the new president of PPMC, and appointed Shingledecker as secretary. R.28-7, PID 1323-24. But a month later, acting as a "Majority Vote of the Members" (i.e. acting as sole manager of 60% shareholder PPDP) Lindeman took "Action by Written Consent of the Members without a meeting" (April 2020 Action). R.28-8, PID 1325-27. In the April 2020 Action, Lindeman enacted a Second Amended Operating Agreement for PPMC; removed Sloane, Shingledecker and Bailey from the Board of Managers; reduced the Board of Managers to one seat occupied by Lindeman; terminated O'Dowd's employment as President; and re-instated himself as President and Chief Executive Officer of PPMC.

Shortly after the April 2020 Action, Lindeman and Shingledecker purchased Bailey's interest in KSDB, and on May 11, 2020, Lindeman replaced Bailey as a KSDB Manager. On the same day, Lindeman and Shingledecker took "Action by Written Consent of the Managers without a Meeting" (May 2020 Action), this time adopting a Third Amended Operating Agreement. R.28-11, PID 1425-1427. Among other things, the Third Amended Operating Agreement re-instated the Board of Managers. The re-constituted Board of Managers provided seats for Sloane as Blue

Fire's Manager (1.5 votes); Lindeman as R&M's Manager (1.5 votes); Shingledecker as one of KSDB's managers (1 vote); and Lindeman as KSDB's other manager (1 vote). R28-10, PID 1391.

On June 10, 2020, Lindeman and Shingledecker again took "Action by Written Consent of the Managers without a Meeting" (June 2020 Action), establishing a new financial reporting resolution, which stated that "current financial reporting obligations" to the Members "are met with the current practice in place" and that "[t]here will be no additional financial reporting or requests recognized from Managers for additional financial reporting." R.28-12, PID 1429.

Contemporaneously with the May 2020 Action, Blue Fire filed an initial complaint in the Court of Common Pleas of Franklin County, Ohio against PPDP and Lindeman seeking injunctive, declaratory, and monetary relief, alleging breaches of fiduciary duty. Lindeman and PPDP removed the case to the Southern District of Ohio. Blue Fire alleged that Lindeman's actions had impacted the "viability and sustainability of Pies & Pints Management Company" and that the April 2020 Action was detrimental to PPMC and Blue Fire.

Lindeman and PPDP filed an answer and motion for judgment on the pleadings. That motion argued that the April 2020 Action was consistent with the terms of the original Operating Agreement because Blue Fire "has one-point-five (1.5) out of five (5) votes on the Board of Managers and is not a Member of PPMC" and, in the April 2020 Action, "the PPMC Members, by unanimous vote, reversed the Board [of Managers] Action of March 16, 2020 and among other actions reinstated Mr. Lindeman as President." R.4, PID 429.

Rather than respond to the motion for judgment on the pleadings, Blue Fire filed a motion for leave to file an Amended Complaint, asserting that "new claims against Defendants that are different from the claims asserted in [the] initial Complaint, rendering moot the arguments set forth by Defendants in their Motion for Judgment on the Pleadings." R. 8, PID 535. Specifically, the

Amended Complaint focuses on the Third Amended Operating Agreement adopted in the May 2020 Action. Blue Fire alleged that the intent of the Third Amended Operating Agreement was to improperly benefit Lindeman by ensuring that he remains in control of PPMC while "illegally stripping Blue Fire of important rights and ensuring that neither it nor Sloane . . . have any meaningful role in the operation and oversight of PPMC." *Id.* In the Amended Complaint, Blue Fire alleges that four provisions of the Third Amended Operating Agreement and the June 2020 Action breach Lindeman and PPDP's fiduciary duties to Blue Fire:

1. Section 6.1(c)(iv) of the Third Amended Operating Agreement. Section 6.1(c)(iv) originally provided for the election and removal of PPMC's managers and explained what would happen to Blue Fire and R&M's right to appoint a Manager to the PPMC Board of Managers if Blue Fire or R&M became sole owner of PPDP. Under the revised provision, "in the event either R&M or Blue Fire becomes the sole equity owner of PPDP, KSDB shall appoint only one KSDB Manager, who shall be Kimberly Shingledecker, who shall have three votes on all matters for which Managers shall be entitled to vote." R.8, PID 535. Blue Fire alleges that this renders its right to buy R&M or sell its own interest "effectively meaningless" because the new provision gives KSDB an extra vote—deadlocking the Board of Managers at three votes for PPDP and three votes for KSDB, notwithstanding PPDP's 60% ownership of PPMC. *Id.* at 555.

2. The Third Amended Operating Agreement removes section 9.12 of the Second Amended Operating Agreement. That provision detailed the procedure for members to make buy-sell offers to other members of PPMC.

3. The Third Amended Operating Agreement removed the quarterly board-meeting requirement of the Second Amended Operating Agreement.

4. The June 2020 Action limits financial reporting requests from the members. Blue Fire alleges that this violates the members' right to financial accounting information about PPMC.

The district court granted Blue Fire's request to amend its complaint. Lindeman and PPDP filed a second motion for judgment on the pleadings. Blue Fire filed a response and cross-motion for judgment on the pleadings. Before the district court could rule on the cross-motions for judgment on the pleadings, Blue Fire moved for leave to file a Second Amended Complaint.

The Second Amended Complaint focused on conduct that occurred during the pendency of litigation. On March 10, 2021, R&M allegedly sent Blue Fire a notice of a Buy/Sell offer. In that notice, R&M purportedly offered to purchase Blue Fire's interest in PPDP for $1.3 million. Under Section 9.12(a) of the PPDP Operating Agreement

> No offer shall be subject to the provisions of this Section 9.12 unless such offer is both an offer to sell the entire interest of the Offeror and an offer to purchase the entire Interest of the Offeree, and such offer must specify the selling or purchase price and that the price of the Interest to be so transferred shall be paid in cash. The selling price and the purchase price specified in such offer must be computed on the basis of the same Interest value. Such offer shall be irrevocable for a period of sixty (60) days (the "Offer Period"), and the Offeree may, on or before the end of the Offer Period, accept either the offer to sell or the offer to purchase (but not both), and upon acceptance, the Offeror shall be required to sell or to purchase, whichever the case may be.

R.4-2, PID 496. Accordingly, Blue Fire treated R&M's offer to buy Blue Fire's interest in PPDP as a simultaneous offer to sell R&M's interest in PPDP to Blue Fire. On April 29, 2021, Lindeman reached out to Sloane via counsel, and requested that "the current owners of [PPMC] participate in good faith negotiations . . . for the purpose of promptly reaching agreement and concluding the necessary transactions such that either (1) Michael Sloane or (2) Rob Lindeman and Kimberly Shingledecker become sole owners of PPMC." R.28-14, PID 1466. On April 30, 2021, Blue Fire responded to R&M's Buy/Sell Offer and accepted R&M's purported offer to sell its 50% interest in PPDP on the terms set in the notice. *Id*. at 1193. On May 13, 2021, however, R&M sent a letter to Blue Fire refusing to sell its interest in PPDP to Blue Fire and indicated that it accepted Blue Fire's purported offer to sell its interest in PPDP.

The Second Amended Complaint primarily adds allegations related to R&M's purported Buy/Sell offer, as well as a request for declaratory judgment against R&M that Blue Fire's acceptance of its offer to sell was valid and binding. In addition, the Second Amended Complaint adds allegations that Shingledecker and KSDB aided and abetted breaches of fiduciary duty to

Blue Fire. Finally, the Second Amended Complaint purports to assert "derivative claims . . . on behalf of Pies & Pints Development Partners, LLC ('PPDP'), against R&M, KSDB, Kim Shingledecker, and PPMC." R.28-1, PID 1181.

On May 27, 2021, the magistrate judge held a telephonic conference with the parties. In an order memorializing the conference, the magistrate judge explained that "[b]ased on the representations of the parties, and to allow the Court time to address the pending dispositive motion, briefing on" Blue Fire's motion for leave to file a second amended complaint "is hereby STAYED pending the resolution of Defendants' Motion for Judgment on the Pleadings." R.34, PID 1491.

On October 19, 2021, the district court entered an order granting Lindeman and PPDP's motion for judgment on the pleadings and denying Blue Fire's cross-motion for judgment on the pleadings. In that order, the district court dismissed Blue Fire's claims with prejudice. The district court first found that because only PPDP is a member of PPMC, not Blue Fire, Lindeman did not owe any fiduciary duties to Blue Fire as Manager of PPMC. But the district court explained that Lindeman did owe fiduciary duties to Blue Fire as the sole manager of PPDP. Still, the district court determined that Blue Fire did not state claims for breaches of fiduciary duties against Lindeman as sole manager of PPDP. The district court also rejected Blue Fire's claim that Lindeman and PPDP had violated the covenant of good faith and fair dealing.

Blue Fire timely appealed.

## II

Blue Fire appeals both substantive and procedural decisions by the district court. Blue Fire argues that the district court erred when it dismissed Blue Fire's complaint with prejudice and when it implicitly denied the motion for leave to file a Second Amended Complaint. Blue Fire

also argues that the district court erred by dismissing its fiduciary duty and good-faith-and-fair-dealing claims.

### A. Breach of Fiduciary Duty Claims

In its Amended Complaint, Blue Fire points to four incidents as bases for a breach-of-fiduciary-duty claim against Lindeman and PPDP. First, a "poison pill" provision in Section 6.1(c)(iv) of the Third Amended Operating Agreement for PPDP. Second, the removal of the Buy-Sell Provision at Section 9.12 of the Second Amended Operating Agreement from the Third Amended Operating Agreement. Third, the removal of the quarterly meeting requirement from the Third Amended Operating Agreement. Fourth, Lindeman and PPDP's failure to provide PPMC's corporate and financial information to Sloane.

We review a district court's grant of judgment on the pleadings under Federal Rule of Civil Procedure 12(c) de novo. *Moore v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021). And "[w]e assess a Rule 12(c) motion 'using the same standard that applies to a review of a motion to dismiss under Rule 12(b)(6)'" *Barber v. Charter T'ship of Springfield, Michigan*, 31 F.4th 382, 386 (6th Cir. 2022) (quoting *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659 (6th Cir. 2021)). So "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Accordingly, when ruling on a defendant's motion for judgment on the pleadings, we "'construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (quoting *Ziegler v. IBP Hog Mkt., Inc.* 249 F.3d 509, 512 (6th Cir. 2001)).

Under Delaware law[1] "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Henkel of Am., Inc. v. Bell*, 825 F. App'x 243, 254 (6th Cir. 2020) (quoting *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010)). The district court explained that, under Delaware law, "a manager of an LLC owes default fiduciary duties to the LLC and its members." R.44, PID 1939 (citing 6 Del. C. § 18-1101(c)). The district court also determined (and none of the parties on appeal dispute) that "none of the operating agreements at issue restrict or limit any of the fiduciary duties owed by the managers covered under the agreements, so as a manager of both PPDP and PPMC, the traditional duties of loyalty and care apply to Lindeman." *Id*. The district court found that PPMC's Third Amended Operating Agreement limits a manager's liability for a breach of the duty of loyalty to PPMC or its members (i.e. to PPDP or to KSDB). *Id*. at PID 1940. Section 6.5(b) of the Third Amended Operating Agreement states:

> (b) <u>Limitation of Liability</u>. A Manager of the Company will not be personally liable to the Company or its Members for monetary damages for breach of fiduciary duties as a Manager, provided that the liability of a Manager (i) for any breach of the Manager's loyalty to the Company or its Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the manager derived an improper personal benefit will not be eliminated or limited hereby.

R.28-10, PID 1398. Accordingly, the district court determined that, "[a]s a manager of PPMC, Lindeman therefore only owes fiduciary duties to PPMC, and its members, PPDP and KSDB." *Id*. Therefore, the district court found that Lindeman only owed Blue Fire fiduciary duties as PPDP's sole manager. *Id.* Neither party appears to object to this conclusion.

---

[1]The parties appear to agree that Delaware law governs this case, as both the PPDP and PPMC operating agreements contain a provision stating that the agreements shall be governed and construed in accordance with Delaware law.

When parties have not contracted around core fiduciary duties, the manager of an LLC is understood to be a fiduciary and is subject to "the core fiduciary duties of loyalty and care." *Auriga Cap'l Corp. v. Gatz Props*, 40 A.3d 839, 852 (Del. Ch. 2012). "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). "Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Id.* at 362, *see also William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011) (discussing the breach of the duty of loyalty in a self-dealing transaction in which LLC managers were on each side of the transaction). Managers are "not permitted to use their position of trust and confidence to further their private interests." *City of Fort Meyers Gen. Empl. Pens. Fund v. Haley*, 235 A.3d 702, 718 (Del. 2020). Nor can fiduciaries "intentionally act[] with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). The duty of care requires that managers avoid "conduct that constitutes reckless indifference or actions that are without the bounds of reason." *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. 2008).

Although the parties devote much of their briefing to whether Lindeman's actions were "unilateral" or approved with the consent of the other Members or Managers, it appears clear from the record that Lindeman had the proper authority to take action. The record shows that Shingledecker—who had control over the other Member, KSDB, and was also one of its Manager representatives on the Board—approved Lindeman's actions with the exception of the April 2020 Action. But this is not dispositive of Blue Fire's breach of fiduciary duty claims. An alleged

breach of fiduciary duty is "'twice-tested' first for legal authorization, and second [for] equity." *Backer v. Palisades Growth Capital II, L.P.*, 246 A.3d 81, 96 (Del. 2021) (quoting *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007)). Accordingly, even if Lindeman's actions were permissible under the terms of the relevant operating agreements, his actions still may have breached his fiduciary duties.

### 1. The Alleged "Poison Pill" Provision at Section 6.1(c)(iv)

Blue Fire first alleges that Section 6.1(c)(iv) of the Third Amended Operating Agreement adds a "poison pill" that adversely affects Blue Fire. That section reads

> Each of R&M's and Blue Fire's right to appoint a Manager as set forth in this Section 6.1(c) shall transfer as follows: (1) if all of R&M's beneficial ownership in PPDP's Percentage Interests is acquired by Blue Fire (i.e., Blue Fire becomes the sole equity owner of PPDP), Blue Fire shall succeed to R&M's rights in this Section 6.1(c); and (ii) if all of Blue Fire's beneficial ownership in PPDP's Percentage Interests is acquired by R&M (i.e., R&M becomes the sole equity owner of PPDP), R&M shall succeed to Blue Fire's rights in this Section 6.1(c); provided, however that in the event either R&M or Blue Fire becomes the sole equity owner of PPDP, KSDB shall appoint only one KSDB Manager, who shall be Kimberly Shingledecker, who shall have three votes on all matters for which Managers shall be entitled to vote.

R.28-10, PID 1391.

Under the Third Amended Operating Agreement, votes on the Board of Managers are allocated as follows: 1.5 votes for the R&M Manager (Lindeman); 1.5 votes for the Blue Fire Manager (Sloane); 1 vote for the First KSDB Manager (Shingledecker); and 1 vote for the Second KSDB Manager (Lindeman). R.28-10, PID 1391. This is consistent with the relative ownership interests in PPMC—60% PPDP, 40% KSDB. The clause stating that KSDB's manager would receive three (rather than two) votes on the Board upon a buyout by Blue Fire or R&M was not present in earlier Amended Operating Agreements. *See* R. 28-5, PID 1286.

11

Blue Fire characterizes the added clause in Section 6.1(c)(iv) of the Third Amended Operating Agreement as a "poison pill." Under the Amended Operating Agreement, if Blue Fire were to buy out R&M's interest in PPDP, it would end up with a majority voting interest on PPMC's board. But under the Third Amended Operating Agreement, if Blue Fire were to purchase R&M's interest in PPDP, or vice versa, it would buy into a deadlock with KSDB, because the "poison pill" provision increases the total number of votes to six and allocates three votes to KSDB—leaving both PPDP and KSDB with three votes apiece. Essentially, PPDP's 60% majority interest in PPMC would be reduced to a 50% voting interest on the PPMC Board of Managers.

To begin, it is not clear that this is a "poison pill" as the term is usually understood. As the district court explained, "[t]his case presents the unusual allegation of a poison pill in an LLC's operating agreement," rather than the adoption of a poison pill as an anti-takeover device in a company's "financial or legal structure." *Id*. at 1941 (quoting Black's Law Dictionary, 11th ed. 2019).

Under Delaware law, a poison pill is not per se invalid. *See e.g. Loventhal v. Hilton Hotels Corp.*, 780 A.2d 245, 250 (Del. 2001). Instead, when a poison pill is adopted as a defensive measure to protect against a hostile takeover, corporate directors are afforded the usual protection of the business judgment rule when they can show "reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and they can "satisfy that burden 'by showing good faith and reasonable investigation.'" *Unocal Corp. v Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (quoting *Cheff v. Mathes*, 199 A.2d 548, 554-55 (Del. 1964)). For a poison pill to stand, it must be "proportional" to the perceived threat of a hostile takeover and it cannot be "coercive or preclusive in character," meaning that it cannot "preclude a [potential buyer] from

making an offer for the combined [company]." *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387 (Del. 1995).

Although this differs from the usual poison pill case the district court accepted the characterization for the purposes of its analysis and reviewed the challenged provision as though it were a poison pill. Specifically, it determined that because "[p]reclusive measures are those that are 'insurmountable or impossible to outflank'" and those circumstances are not present in the instant case, Blue Fire did not state a claim for breach of fiduciary duty as to the "poison pill." R.44, PID 194. (quoting *Selectica, Inc. v. Versata Enters.*, No. 4241-VCN, 2010 WL 703062, at *20 (Del. Ch. Feb. 26, 2010)). This is correct. Although the provision may dilute PPDP's power on the Board of Managers in the event of a hypothetical buyout of R&M, Blue Fire's suggestion that it would buy into a "deadlock" is misleading. Appellant Br. at 25. As the district court explained, the amended provision contemplates the appointment of a neutral third party to oversee and resolve any deadlocked issues. *Id.* at 1943-44.

Further—and outside the formal context of a "poison pill" review—Blue Fire retains important rights under the Third Amended Operating Agreement that mitigate against any detrimental impact of the "poison pill." Even if Blue Fire acquired R&M and became stuck in a deadlock with KSDB, the Third Amended Operating Agreement confers an effective veto on a majority of the Membership. Section 6.3(b) of the Third Amended Operating Agreement explains that certain Manager actions require a majority vote of the Members:

> "(b) Events Requiring Member Approval of Manager Action. Upon a vote of the Managers to take action, the Company shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law, the Articles or this Agreement) also obtaining a Majority Vote of the Members:
>
> > (i) Liquidate, dissolve or wind-up the business and affairs of the company . . .

> (ii)    Amend, alter or repeal any provision of this Agreement or the Certificate of Formation;
>
> (iii)    Create or authorize the creation of, or issue any additional class or series of Units or other equity security of the Company . . .
>
> (iv)    Cause or permit any subsidiary of the Company to issue any class or series of equity securities . . .
>
> (v)    Increase or decrease the size of the Board of Managers or admit new Members.

R.28-10, PID 1397. Under that provision, Blue Fire—holding 60% of the membership votes as sole owner of PDPP—could exercise veto authority over major Board decisions with which it disagreed.

Blue Fire argues that "Delaware law does not require Blue Fire to make allegations that Lindeman's actions breached the company agreements or violated any law or made it 'mathematically' impossible for Blue Fire to overcome the hurdle to gain more control. Rather, Blue Fire only needs to set forth sufficient facts to show that Lindeman's actions were taken with the improper purpose to thwart an interest owner's right to participate in the company's decision-making process or to deprive the owners of important corporate information." Appellant Br. at 30 (citing *Coster v. UIP Co., Inc.*, 255 A.3d 952, 961-62 (Del. 2021) and *Largo Legacy Grp., LLC v. Charles*, No. 2020-0105-MTZ, 2021 WL 2692426)). But even under this broader theory of liability, it is not clear that Lindeman's actions have the effect of "thwart[ing]" Blue Fire's ability to "participate in the corporate decision-making process." Because Blue Fire could still enjoy its seats on the Board—albeit, mediated by a neutral third party in the event of a deadlock—and because it retained effective veto authority over major decisions of the Board, Blue Fire was not meaningfully restricted from control over PPMC. Further, the new language in Section 6.1(c)(iv) applies with equal force to R&M if it bought out Blue Fire's interest in PPDP—which undermines Blue Fire's argument that Lindeman intended to "thwart [PPDP's] right to participate in the

company decisionmaking process." Accordingly, Blue Fire's "poison pill" allegations do not state a claim for a breach of fiduciary duty against Lindeman and PPDP.

### 2. The PPMC Buy-Sell Provision at Section 9.12

Blue Fire next argues that the deletion of the PPMC buy-sell provision in the Third Amended Operating Agreement was also a breach of fiduciary duty. In its Amended Complaint, Blue Fire alleged that "[t]his amendment deprived PPDP, and, indirectly, Blue Fire, of its right to make a Buy-Sell offer to the other members of PPMC, thereby ensuring Defendant Lindeman's effective control of PPMC to Blue Fire's detriment." R. 15, PID 820.

Under Section 9.12 of the Amended Operating Agreement:

Buy-Sell. Each Member or Members (collectively, the 'Offeror') shall have the right at any [t]ime to serve upon any or more of the other Members (collectively, the 'Offeree') a notice in writing which shall contain an offer to sell the entire Interest in the Company of the Offeror or to purchase the entire Interest in the Company of the Offeree, as set forth below. Any Transfer of an Interest under this provision is not subject to any of the Transfer restrictions set forth in Article 9.

R.28-5, PID1305.

The Third Amended Operating Agreement includes no comparable provision. The district court dismissed this claim on the ground that "Plaintiff provides no further detail concerning this allegation and argues that this action is impermissible under Delaware law but fails to inform the court as to why." R. 44, PID1945. Accordingly, the district court dismissed the claim as a "generalized conclusion with no supporting facts." *Id*. In its briefing, Blue Fire argues that due to the "poison pill," Appellant can only get "majority votes on PPMC's board" by "purchas[ing] KSDB's entire interests through [the] PPMC Buy-Sell Provision. However, this cannot be done anymore because the Third Amend[ed] OA removed PPMC Buy-Sell Provision." Appellant Br. at 26.

But the Buy-Sell rights in Section 9.12 describe the rights of a "member" to offer to purchase or sell the interest of any other "member." At the time of the Amended Complaint (and the proposed Second Amended Complaint), Blue Fire was not a "member" of PPMC, but instead was a constituent part of PPDP. Accordingly, Blue Fire's rights have not been impacted by this change, only PPDP's have. Lindeman does not owe fiduciary duties to Blue Fire as President of PPMC; he owes fiduciary duties to Blue Fire only as PPDP's sole manager. Accordingly, Blue Fire cannot state a claim for breach of fiduciary duty as to the deleted Buy-Sell provision.

3. Deletion of the Quarterly Meeting Requirement at Section 6.1(e)

Blue Fire alleges that the removal of quarterly meetings from the Third Amended Operating Agreement was also a breach of fiduciary duty. Under the Third Amended Operating Agreement, "[r]egular meetings of the Board shall be mutually agreed on by the Majority Vote of the Board at such time and place as from time to time may be determined by the Board." R.28-10, PID 1392. In contrast, the Amended Operating Agreement provided that "[r]egular meetings of the Board shall be held not less frequently than quarterly at such time and place as from time to time may be determined by the Board." R.28-5, PID 1287. Blue Fire argues that the change from a regular meeting requirement to a discretionary system as determined by the Board of Managers "deprive[s] Blue Fire of its right to participate in PPMC's business and operations." Appellant Br. at 7. The district court understood Blue Fire to be arguing that "because PPMC board meetings will only be held if [Blue Fire's] manager, Sloane, can convince either Lindeman or Shingledecker to agree to a board meeting, which Plaintiff insists is highly unlikely . . . the new meeting provision accomplishes nothing more than perpetuating Lindeman's control of PPMC and allowing him to operate without board oversight." R.44, PID1945.

The district court found that the Amended Complaint did not "allege that [Appellant ever made a] request for a board meeting [that] was denied or point to any legal requirement for PPMC to hold quarterly meetings. Instead, Plaintiff claims that PPMC's lead lender requested a meeting, which was denied." *Id.* at 1945-46. The district court noted that "[s]uch an allegation, however, fails to specify how Lindeman and PPDP breached any fiduciary duties owed to Plaintiff, as a member of PPDP" and accordingly dismissed the claim. *Id.*

In its briefing, Blue Fire does not point to any legal requirement for quarterly meetings and does not explain how the quarterly meeting requirement affects fiduciary duties owed to Blue Fire, as opposed to PPDP. Instead, Blue Fire argues that the district court's analysis "failed to see the interworking connection between the four separate incidents and did not consider Defendants' conduct as a whole." Appellant Br. at 28. As discussed above, neither the "poison pill" nor the removal of the Buy-Sell provision appear to meaningfully interfere with Blue Fire's current or future ability to impact PPMC's management. And standing alone, it is hard to see how the quarterly meeting requirement ties into a scheme to freeze Blue Fire out of corporate governance, especially without a corresponding allegation that Blue Fire requested a board meeting and was refused. Finally—as with the Buy-Sell provision—Blue Fire does not explain how Lindeman breached any fiduciary duties owed to Blue Fire, as a member of PPDP, rather than duties owed to PPDP, as a member of PPMC. Accordingly, Blue Fire does not allege a breach of fiduciary duty claim as to the removal of the quarterly meeting requirement.

### 4. PPMC's Corporate and Financial Information

Blue Fire's final claim is that that Lindeman has improperly deprived Blue Fire of corporate information to which it is entitled, and that Lindeman has "blocked requests by Mr. Sloane, the Blue Fire Manager from receiving accounting information relating to PPMC's

operations." R.15, PID 821, ¶ 43. Blue Fire alleged that Lindeman "caused PPMC to take [the June 2020 Action]," which provided that "the Board of Managers met and passed a resolution that the current financial reporting obligations of the Company[] to Members are met with the current practices in place. There will be no additional financial reporting or requests recognized from Managers for additional financial reporting." *Id.* at 822, ¶ 45. The Amended Complaint appears to concede, however, that Lindeman has not completely stonewalled Blue Fire from receiving any corporation information, but instead that Lindeman has refused to provide "any PPMC corporate information other than what he determines should be provided." *Id.* at 821, ¶ 44.

The district court denied this claim, finding that although the Operating Agreements do not limit Members' rights to inspect PPMC's books and records, "Plaintiff is not a member of PPMC, and Plaintiff therefore does not have any express rights to the books of account under PPMC's operating agreements." R.44, PID1946. Because "Lindeman, in his capacity as President and PPMC manager, does not owe Plaintiff any fiduciary duties as a non-PPMC member" the district court found that there had been no breach of fiduciary duties, because Blue Fire was not owed any fiduciary duties with respect to PPMC's corporate information in the first place.

As with the claim based on the quarterly meetings, Blue Fire does not appear to dispute this finding by the district court. Instead, it relies on the same argument that the district court erred by "fail[ing] to see the interworking connection between the four separate incidents and did not consider Defendants' conduct as a whole." Appellant Br. at 28. In light of the apparent concession that neither Sloane nor Blue Fire were actually entitled to this information under the Amended Operating Agreements, as well as the fact that Lindeman did provide *some* information to Sloane and Blue Fire, it is not clear how Lindeman breached any fiduciary duties owed to Blue Fire as a

member of PPDP. Accordingly, the district court did not err in dismissing the fiduciary-duty claim based on the failure to provide corporate and financial documents.

### B. Good-Faith-and-Fair-Dealing Claim

Independent of its breach-of-fiduciary-duty claims, Blue Fire also challenges the district court's dismissal of its claims that Lindeman breached the duty of good faith and fair dealing. In its complaint, Blue Fire alleged that Lindeman breached the duty of good faith and fair dealing by "engag[ing] in the misconduct specified above intentionally, in bad faith, and with the intent to derive improper personal benefit, i.e. stripping Blue Fire of its contractual rights for the illegal purpose of ensuring that he remained in control at PPDP and PPMC for his improper personal benefit." R.15, PID 825, ¶ 56. The district court dismissed this claim, noting that in order to "state a claim for breach of the implied covenant, [a party] must allege a specific implied contractual obligation" and that Blue Fire merely relied "on general allegations of Lindeman's bad faith conduct to support its claim." *Id*. (quoting *Klein v. Wasserman*, No. 2017-0643-KSJM, 2019 WL 2296027, at *21 (Del. Ch. May 29, 2019). Further, the district court noted that "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." *Id.* (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010).

In *Nemec*, the Supreme Court of Delaware stated "[w]e will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126. The court stressed that the implied covenant "only applies to developments that could not be anticipated, not developments that the parties simply failed to consider—particularly where the contract authorizes the [Defendant] to act exactly as it did here." *Id*. And the court noted that "Delaware's implied duty of good faith and fair dealing is not an

equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract. Rather the covenant is a limited and extraordinary legal remedy." *Id.* at 1128.

Blue Fire argues that *Nemec* is distinguishable and the district court erred. But Blue Fire does not address the district court's principal finding that Blue Fire failed to identify a "specific implied contractual obligation" breached by Lindeman, and instead relied on "general allegations of Lindeman's bad faith conduct to support its claim." R. 15, PID 825. Further, *Nemec* is pertinent. Blue Fire argues that "[i]n *Nemec*, a stock plan expressly authorizes timing and price of redemption" and "when the defendants exercised the right under the stock plan according to the time and price provided, the court could not 'infer language that contradicts a clear exercise of that right.'" Appellant Br. at 31 (quoting *Nemec*, 991 A.2d at 1127). And further, "Section 11.2 of the Second OA provides 'this Agreement . . . may be amended, waived or modified from time to time only upon a Majority Vote of the Members," and therefore contemplates that "Majority approval is a necessary but not sufficient condition for the amendment to be adopted." *Id.* at 32. Blue Fire appears to argue that there is also an implied condition that any amendment must not be "invalid, unenforceable, or lacking mutual consent." *Id.* at 32. This is doubly flawed. First, Section 11.2 addresses the members' consent to any amendments—Blue Fire is not a member, but PPDP is. And second, Blue Fire does not explain why this panel should ignore *Nemec*'s instruction that a claim for breach of the implied covenant of good faith generally cannot be based "on conduct authorized by the agreement." *Nemec*, 991 A.2d at 1126.

The Delaware Supreme Court has explained that "parties are liable for breaching the covenant [of good faith] when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap v.*

*State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005). Accordingly, the Delaware Supreme Court has "recognized the 'occasional necessity' of implying contract terms to ensure the parties' 'reasonable expectations' are fulfilled." *Id.* The court has taken a cautious approach when reading implied contractual terms into existing contracts, recognizing that reformation of contractual terms "should be [a] rare and fact-intensive' exercise, governed solely by 'issues of compelling fairness.'" *Id.* (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)). Accordingly, the doctrine is applied only "when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of. . . had they thought to negotiate with respect to that matter." *Id*. (quoting *Katz v. Oak Indus.*, 508 A.2d 873, 880 (Del. Ch. 1986)). Blue Fire's Amended Complaint does not meet this searching standard.

Because the Amended Complaint fails to allege that the developments of which Blue Fire complains "could not be anticipated" and because Blue Fire fails to identify a "specific implied contractual obligation" breached by Lindeman, the district court did not err in dismissing Blue Fire's good-faith-and-fair-dealing claim.

## C. Dismissal of Blue Fire's Claims with Prejudice

Blue Fire argues that the district court improperly dismissed its complaint with prejudice. The parties disagree on the proper standard of review for a dismissal with prejudice. Even on de novo review, however, it is clear that the Second Amended Complaint could not have saved the allegations of the Amended Complaint.

As discussed above, Blue Fire alleges four breach of fiduciary duty claims and one breach of the duty of good-faith-and-fair dealing. And as we explained, three of those four breach of fiduciary duty claims—the Buy-Sell provision, the quarterly meeting requirement, and the

corporate and financial information claim—are claims of PDPP (to whom Lindeman owed fiduciary duties) not Blue Fire. True, the Second Amended Complaint claims to assert "derivative claims, on behalf of Nominal Defendant PPDP, against Lindeman, as the sole manager of PPDP and President and manager of PPMC, and PPMC for unlawful actions taken by Lindeman to eliminate PPDP's rights and protections under the PPMC operating agreement." R.28-1, PID 1182. But these claims do not "save" the allegations Blue Fire made on its own behalf in the Amended Complaint so much as they allege new causes of action on behalf of a different plaintiff, which could be brought in a separate litigation.[2] This is clear from the face of Blue Fire's motion for leave to amend, which makes clear that the amendment was not intended to cure deficiencies of the Amended Complaint but to add new parties and causes of action:

> Plaintiff Blue Fire Capital, LLC ("Blue Fire" or "Plaintiff") hereby moves the Court pursuant to Rule 15(a) of the Federal Rules of Civil Procedure for entry of an order permitting Blue Fire to file a Verified Second Amended Complaint ("Second Amended Complaint") *instanter* to assert new and related claims against Robert A. Lindeman ("Lindeman"), to add R&M Advisors LLC ("R&M"), Pies & Pints Management Company, LLC ("PPMC"), KSDB LLC ("KSDB"), and Kimberly Shingledecker ("Shingledecker") as Defendants (collectively, "Defendants"), to assert derivative claims on behalf of Nominal Defendant Pies & Pints Development Partners, LLC ("PPDP"), and seek injunctive relief to stop the recent unlawful actions taken by Lindeman and R&M that place Blue Fire and PPDP in imminent risk of irreperabl[e] injury.

R.28, PID 1172. The new allegations raised in Blue Fire's Second Amended Complaint dealt with the contested Buy-Sell actions that took place in the spring of 2021, after the cross-motions for

---

[2] Notably, Lindeman and PPDP concede that

> [T]he new claims against new entities and individuals who were not yet (and never have been) parties to this lawsuit that Blue Fire sought to include when it requested leave to file its proposed Second Amended Complaint were not dismissed by the district court with prejudice in this matter. Those claims have never been asserted, have never been ruled upon, and could have been brought in a separate action since the claims are based on different operative facts and against individuals and entities who were not originally made parties to this lawsuit.

Appellee Br. at 24–25.

judgment on the pleadings had already been filed and briefed. With respect to the alleged "poison pill" provision, it is not clear how any amendment could save Blue Fire's allegations as the neutral mediator and the provisions of the Third Amended Operating Agreement that would grant Blue Fire an effective veto over major Board actions in the event of a buyout mitigate against harm suffered by Blue Fire as a result of the change. Blue Fire argues that "additional factual allegations" that could save "its claim that Lindeman to[ok] action to perpetuate his control of PPDP and PPMC, to the detriment of Blue Fire, without any legitimate business reason for doing so." Appellant Br. at 15. But aside from "derivative claims" purportedly alleged on behalf of PPDP, the new allegations in the proposed Second Amended Complaint primarily concern the unrelated Buy/Sell offer in March 2021. These facts cannot save Blue Fire's fiduciary-duty claims. And as to the good-faith-and-fair-dealing claim, Blue Fire has not identified any "specific implied contractual obligation" breached by Lindeman that would trigger such a claim. Even on de novo review the district court properly dismissed the case with prejudice.

### D. Motion for Leave to Amend

Intertwined with the district court's dismissal with prejudice is the district court's purported failure to consider Blue Fire's motion for leave to amend.[3] Blue Fire argues that a district court abuses its discretion when it disposes of a complaint by summary judgment or dismissal without first considering a pending motion to amend. Appellant Br. at 17. We have explained that "[g]iven the policy of liberality behind Rule 15(a), it is apparent that when a motion to amend is not even

---

[3] Lindeman and PDPP argue that the district court "thoughtfully" considered Blue Fire's motion and only stayed the motion "after discussion among the parties via telephonic conference." Appellee Br. at 25. Lindeman and PDPP represent that the "substance of the discussion with the district court at that status conference was that the proposed second amended complaint did not substantively change the claims that were already pending before the district court." *Id.* 28. On the record before us, the only memorialization of that status conference is the magistrate judge's order stating "[b]ased on the representations of the parties, and to allow the Court time to address the pending dispositive motion, briefing on Plaintiff's Motion (Doc. 28) is hereby STAYED pending the resolution of Defendants' Motion for Judgment on the Pleadings." R.34, PID 1491.

considered, much less granted, an abuse of discretion has occurred." *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987). But a court need not grant leave to amend "where amendment would be 'futile.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)). And amendment is "futile when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Id.* As explained above, the proposed Second Amended Complaint does not save Blue Fire's allegations of breach of fiduciary duty claims or breach of the duty of good-faith-and-fair dealing claims against Lindeman. At best, the Second Amended Complaint alleges distinct, new allegations on behalf of the derivative plaintiff, PDPP, and cannot save the faulty allegations of the Amended Complaint. Accordingly, the district court did not err by implicitly denying Blue Fire's motion for leave to amend.

### III. Conclusion

For the foregoing reasons, we AFFIRM.

**HELENE N. WHITE, Circuit Judge, dissenting in part.** I do not agree with the conclusion that Blue Fire failed to state a breach-of-fiduciary-duty claim with respect to the purported "poison pill" provision in Section 6.1(c)(iv) of the Third Amended Operating Agreement.

Lindeman owed Blue Fire fiduciary duties as sole manager of PPDP. *See Auriga Cap'l Corp v. Gatz Props.*, 40 A.3d 839, 952 (Del. Ch. 2012). When Lindeman acted as PPDP's "authorized signatory" and adopted the Third Amended Operating Agreement in the May 2020 action, he made a decision that was detrimental to Blue Fire. Under the Third Amended Operating Agreement, Blue Fire can only ever acquire 50% of the votes on the PPMC Board of Managers, even if it acquires R&M's interest and thus a 60% interest in PPMC.

The district court found that Blue Fire could not state a claim for breach of fiduciary duty in part because "the provision applies equally to Plaintiff and [Lindeman's] R&M." R.44, PID 1943. Although this is true, it ignores the context of Blue Fire's allegations. As alleged in the Amended Complaint, Lindeman controlled 1.5 votes on the Board of Managers as the R&M Manager and another vote as a KSDB Manager. Accordingly, Lindeman already controlled 50% of the votes on the Board of Managers and would have no incentive to buy Blue Fire's interest because if he did so, he would exchange one 50% voting block for another (2.5 of 5 votes or 3 of 6 votes in the event of a buyout). In contrast, Blue Fire's only route to control over the PPMC Board of Managers—acquisition of R&M's interest in PPDP—was eliminated by the change to Section 6.1(c)(iv).

I would also reverse the district court's failure to address and grant Blue Fire's motion for leave to amend and its dismissal with prejudice of Blue Fire's remaining breach-of-fiduciary-duty claims. Blue Fire's other breach-of-fiduciary-duty claims are fatally flawed because they state

25

claims on behalf of PPDP, rather than Blue Fire. But the proposed Second Amended Complaint sought to "assert derivative claims on behalf of Nominal Defendant Pies & Pints Development Partners." R.28, PID 1172. The conclusion that these derivative claims could not "save" Blue Fire's breach-of-fiduciary-duty claims because they "allege new causes of action on behalf of a different plaintiff" is correct insofar as the Second Amended Complaint added claims regarding the exercise of the buy/sell agreement. Op. at 26. But this case was always about the changes to the operating agreement that harmed PPDP and Blue Fire. Recharacterizing the remaining breach-of-fiduciary-duty claims as derivative on behalf of PPDP would remedy a key weakness to those claims—that as President of PPMC Lindeman owes fiduciary duties to PPDP as a member but does not owe fiduciary duties directly to Blue Fire—but does not change the core issues of the litigation. The proposed Second Amended Complaint was not "futile," and "given the policy of liberality behind Rule 15(a)," I would reverse to permit Blue Fire to add derivative claims on behalf of PPDP. *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987).